IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION


| | | |
|---|---|---|
| THEODORE W. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-0203-CV-W-NKL |
| | ) | |
| RICHARD McKINLEY, et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## ORDER

Before the Court are Defendant Richard McKinley's Motion for Judgment as a Matter of Law after Trial [Doc. # 367] ("JMOL"), and Motion for New Trial and Alternative Motion to Alter or Amend Judgment [Doc. # 369].[1] For the following reasons, the Court denies the motions.

I.      **Background**

    A.      **Procedural History**

Plaintiff Theodore W. White ("White") was tried three times in Missouri state courts for the alleged molestation of his adopted daughter, Jami.  The allegations of abuse were made by Jami while a dissolution of marriage action was pending between White and his

---

    [1] These motions are presented in the alternative, requesting: first, judgment as a matter of law; second, a new trial; and, third, altered or amended judgment.

1

wife, Tina,[2] who was Jami's biological parent. At his first trial, White was convicted of twelve counts of sexual molestation. Before he was sentenced, he fled to Costa Rica where he was apprehended and eventually returned to Missouri.

Because White fled the jurisdiction pending sentencing, Missouri's escape rule[3] would normally apply. However, the Missouri Court of Appeals waived the rule and permitted him to appeal his conviction because of evidence which was uncovered after his conviction. "White learned after the verdict that Tina White and the chief investigator of the alleged crime, [ Detective McKinley,] had been engaged in a romantic relationship . . . and the prosecutor knew about the relationship for approximately one year but failed to disclose the information to the defense." *State v. White*, 81 S.W. 3d 561, 566 (Mo. Ct. App. 2002). The Missouri Court of Appeals concluded that evidence of the romantic relationship between Tina and Detective McKinley during the investigation "was material impeachment evidence that the defense was denied by the suppression of the information." *Id*. at 570. The Missouri court also addressed Jami's diary that had been found by Detective McKinley during his investigation, but which he did not seize as evidence. The Missouri court stated that "one does not have to be in law enforcement to know that it would not be routine to review the diary and then return it to the complaining witness." *Id.* at 569-70. Because the State

_____

[2] Tina is now married to Detective Richard McKinley ("Detective McKinley"). For the sake of clarity, she will be referred to as Tina throughout the opinion rather than by her surname.

[3] Missouri has an escape rule that normally precludes any appeal when a defendant has fled the jurisdiction after conviction but before sentencing.

2

violated its duty to disclose evidence favorable to the defense, the Missouri Court of Appeals set aside White's conviction and remanded the case for a new trial.

White's second trial on the molestation charges resulted in a hung jury, eleven for acquittal and one for conviction. At his third criminal trial, in January and February 2005, White was acquitted. Having remained incarcerated post-appeal and throughout the second and third trials, White was released from custody in February 2005.

On March 4, 2005, White filed this § 1983 action against Detective McKinley and Tina, alleging that Detective McKinley deprived him of procedural due process in part by failing to preserve the diary as evidence and failing to disclose his romantic involvement with Tina. White also asserted a claim for conspiracy to violate § 1983 against Detective McKinley and Tina, alleging that they conspired together to deprive him of procedural due process.[4] Shortly before trial, Detective McKinley filed a motion for summary judgment claiming that he was entitled to qualified immunity. Tina also sought summary judgment. After the Court denied Detective McKinley's request for qualified immunity on the 1983 and conspiracy claims, Tina and Detective McKinley took an immediate interlocutory appeal.

_____

[4] White also filed claims based on other constitutional torts and various common law torts. The court granted summary judgment in favor of Tina and Detective McKinley on these other constitutional claims and White eventually dismissed the common law torts. The City of Lee's Summit, Detective McKinley's employer, was also sued by White, but settled with White early in the litigation.

The United States Court of Appeals for the Eighth Circuit considered Tina and Detective McKinley's interlocutory appeal in *White v. McKinley*, 519 F.3d 806 (8th Cir. 2008). In that case, the Eighth Circuit expressly held that

> [t]he right *Brady* describes definitely applies to prosecutors and imposes upon them an absolute disclosure duty. But, *Brady*'s protections also extend to actions of other law enforcement officers such as investigating officers. However, an investigating officer's failure to preserve evidence potentially useful to the accused or their failure to disclose such evidence does not constitute a denial of due process in the absence of bad faith. *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir.2004). "[T]he recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial." *Id.* Consequently, to be viable, White's claim must allege bad faith to implicate a clearly established right under *Brady*.
>
> Upon review, we agree with the district court that the facts alleged here meet the bad faith standard. Treating the facts as alleged to be true, a reasonable juror could find Richard deprived White of a fair trial in bad faith by deliberately steering the investigation to benefit his love interest, Tina. Richard deliberately withheld from prosecutors the full extent of his relationship with Tina and failed to preserve the alleged victim's diary which did not corroborate the molestation allegations. Failing to preserve the diary deprived White of his right to a fair trial, in part, because he could not testify about the diary without waiving his right not to testify. Whether Richard's failure to disclose the full extent of his relationship with Tina and preserve the diary were done in bad faith are disputed factual questions inappropriate for summary judgment.

*White v. McKinley*, 519 F.3d 806, 813-14 (8th Cir. 2008). With regard to the diary and his relationship to Tina, the Eighth Circuit stated: "We hold that no reasonable police officer in Richard's shoes could have believed that he could deliberately misrepresent the nature and length of his relationship with Tina, or that he could deliberately fail to preserve a child victim's diary containing potentially exculpatory information." *Id.* at 814. Because there

4

were disputed issues of fact concerning Detective McKinley's state of mind, the Court of Appeals affirmed the District Court's denial of summary judgment and remanded for trial.

### B. Federal Trial Evidence

After the case was returned to the District Court, a jury trial was held on White's claim that Detective McKinley and Tina denied him his right to a fair trial. The evidence at that trial, viewed in the light most favorable to the verdict,[5] showed that Ted White moved into Tina's home shortly after they met. At the time, Tina had custody of her two children by a prior marriage, Jami and Danny. White eventually agreed to adopt Jami and Danny but their biological father would not agree to terminate his parental rights. In 1995, he changed his mind and permitted White to adopt both children. Sometime thereafter an acquaintance asked Tina why the children's biological father finally agreed to give up his rights. Tina said she threatened to charge him with child molestation if he didn't cooperate. White adopted Tina's children in January 1996.

Throughout their marriage Tina and White spent a lot of money which became a serious problem when White had to change jobs. In the fall of 1997, the parties were openly in conflict and Tina and the children gathered White's belongings while he was gone and put them in the garage, locking White out of he house. When White got home, he broke down the door and went to bed. Sometime thereafter, the White's housekeeper, Nina Morerod

---

[5] The facts are viewed in the light most favorable to the jury verdict. *See Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F. 3d 1001, 1009 (8th Cir. 2008). The Court will not attempt to summarize all the evidence because it is voluminous.

observed Detective McKinley at the house preparing an estimate for repair of the broken door frame. Tina had told Ms. Morerod that someone was coming to repair the door. Detective McKinley admitted at trial that he had a side business doing home repairs. White and Tina eventually separated around Halloween after a dispute about a mortgage check which Tina cashed, keeping fifty percent of the proceeds. During this separation Tina filed for divorce.

White and Tina eventually reunited and White returned to the family home, but unbeknownst to White, Tina did not dismiss the divorce petition. Thereafter, Tina told White that during their separation she had kissed a Lee's Summit fireman that she met at a bar. The fireman liked motorcycles. Later evidence established that Detective McKinley rode a motorcycle and was a Lee's Summit policeman. Tina also told a co-worker, Claudia Baker, that she had a cop boyfriend who was helping Tina get rid of Tina's husband.

After White and Tina reunited, they continued to have disputes about money. In February 1998, White put Tina on a budget and had the locks changed at his business. On March 21, 1998, Jami first made allegations of sexual abuse. At the time, she was twelve years old. After Jami made sexual abuse allegations against White, Detective McKinley was assigned to be the lead investigator which was the role he usually took in sexual abuse investigations for the Lee's Summit Police Department. During that investigation, Detective McKinley found Jami's diary. The diary described White as a good father with whom Jami wanted to spend more time and Tina as unloving. In the diary Jami said she wanted to be

6

closer to her mother. As part of his investigation Detective McKinley took pictures of Jami's room, her hobby horse, mirrors and door frames, yet he did not seize the diary. The diary later disappeared and neither Jami nor Tina can say what happened to it.[6]

Detective McKinley did at least two other things that aren't normally done during an investigation of a complaint involving sexual abuse of a child. Detective McKinley declined White's attorney's offer to have White give a statement. More importantly, Detective McKinley interviewed Jami before her CPC exam with Child Protective Services. Law enforcement officials do not interview victims about the details of a sexual molestation charge before a trained professional can conduct the CPC exam. This is done to ensure that the memories of the child are not contaminated by leading questions or suggestive statements by law enforcement.

Before the first trial, the prosecutors learned that Tina and Detective McKinley had a relationship but both Tina and Detective McKinley lied to the prosecutors about the extent of the relationship. They told the prosecutors that their relationship did not begin until after Detective McKinley's investigation was completed. The prosecutors were also told that Detective McKinley was not involved with the children before the first trial. Had the prosecutors known that the relationship was ongoing during the investigation, they would have revealed it to the defense.

_____

[6] Tina told Prosecutor Mettler she had asked Jami for the diary but Jami denied that her mother ever asked her for the diary. Jami also testified that her mother knew where the diary was kept. No one can now remember what happened to the diary.

7

The verdict-directing jury instructions on White's § 1983 and conspiracy claims are attached. [*See also* Doc. # 348, Jury Instructions.] In sum, the jury was instructed that it must render a verdict against Detective McKinley if it found: (1) that Detective McKinley failed to disclose, or failed to preserve, evidence material to White's criminal-trial defense; (2) that Detective McKinley did so in bad faith; and (3) that this conduct injured White. [Doc. # 348, Instr. 15.] The jury was further instructed, "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the accused, the result of the proceeding would have been different." *Id.* The jury found in favor of White on both counts, assessing actual damages in the amount of $14 million and punitive damages against both Detective McKinley and Tina in the amount of $1 million each.

## II.  Discussion

### A.  Motion for Judgment as a Matter of Law after Trial[7]

---

[7] A significant portion of Detective McKinley's JMOL is devoted to rearguing the issue of qualified immunity already decided by the Eighth Circuit. Because there is ample evidence to prove all the facts relied on by the Eighth Circuit when it denied Detective McKinley's Motion for Summary Judgment on qualified immunity, the Eighth Circuit's opinion stands as the law of the case. *See Unigroup, Inc. v. Winokur*, 45 F.3d 1208, 1211 (8th Cir. 1995) (stating that doctrine of law of the case prevents relitigation of settled issues in an action, protecting parties' expectations, and ensuring uniformity of decisions, and promoting judicial efficiency); *Jones v. United States*, 255 F.3d 507, 510 (8th Cir. 2001) (stating that law of the case doctrine extends to all issues implicitly settled by appellate court, not just to actual holdings). Moreover, even if the issue of qualified immunity were to be relitigated, the evidence demonstrates that Detective McKinley is not entitled to qualified immunity because he withheld potentially exculpatory evidence in bad faith. Detective McKinley's argument that a police officer has no obligation to preserve exculpatory evidence if he tells the prosecutor about it is also contrary to the Eighth Circuit's opinion in this case. The Eighth Circuit held that a police officer is responsible if he withholds the evidence in bad faith . Furthermore, there is ample evidence that Detective McKinley did not truthfully tell the prosecutor about the evidence he now claims to have

8

On a motion for judgment as a matter of law, the Court must give "great deference to the jury's verdict." *Heaton v. The Weitz Co., Inc.*, 534 F.3d 882, 889 (8th Cir. 2008) (citation omitted). To survive a motion for judgment as a matter of law, the nonmoving party must present more than a scintilla of evidence. *Gill v. Maciejewski*, — F.3d —, No. 07-3451, 2008 WL 4777127 (8th Cir. Nov. 4, 2008). The nonmoving party receives the benefit of all inferences which can be drawn without resort to speculation. *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 908-09 (8th Cir. 2005). Indeed, the court must

> consider the evidence in the light most favorable to the jury verdict. Specifically, we assume all conflicts in the evidence were resolved in [Plaintiffs'] favor, assume [Plaintiffs] proved all facts that [their] evidence tended to prove, and give [Plaintiffs] the benefit of all favorable inferences that reasonably may be drawn from the proven facts.

*Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1009 (8th Cir. 2008) (citations omitted)

### 1.    Exculpatory Evidence

In the face of overwhelming evidence, Detective McKinley argues that the jury's verdict on White's § 1983 claim was without evidentiary support. The Court considers Detective McKinley's arguments concerning each piece of evidence in turn, while recognizing that it was within the province of the jury to find that the collective absence of exculpatory evidence in White's first trial created a reasonable probability that the outcome of that trial would have been different had the exculpatory evidence been available. *United*

---

revealed.

*States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996) (considering whether a criminal defendant had stated a *Brady* claim).

### a. Relationship Between Tina and Detective McKinley

Detective McKinley argues that his relationship with Tina did not violate White's right to a fair trial because he disclosed the existence of the relationship to the prosecutor. In response, White asserts that Detective McKinley failed to disclose the full nature and extent of the relationship. Specifically, Detective McKinley lied to the prosecutors about: (1) when the relationship began; (2) his involvement with Tina's children prior to the first trial; and (3) Detective McKinley and Tina's intent to deprive White of a fair trial.

### (1) Timing of the relationship

It is undisputed that Detective McKinley told prosecutors that his relationship with Tina began after he completed his investigation. However, there was evidence from which a reasonable juror could conclude that the relationship began before the abuse allegations were even made. Nina Morerod testified that she saw Detective McKinley at the White's residence prior to the abuse allegations, and he was measuring a door for repair. Ms. Morerod also said that Tina told her that someone was coming to look at the door and Detective McKinley admitted that he had a part time home repair business. While Detective McKinley disputes Ms. Morerod's credibility, his lawyer extensively cross-examined her about her prior statements and otherwise challenged her credibility. Unless Ms. Morerod's testimony was so incredible or impossible that no reasonable juror could believe it, it was up

10

to the jury to weigh her credibility. *See United States v. Mitchell*, 528 F.3d 1034, 1041 (8th Cir. 2008) (citations omitted) ("[A]ttacks on the sufficiency of the evidence based on the witnesses' credibility are rarely an appropriate ground for reversal. We would reject the evidence only if it asserted facts straying into the realm of impossibility"). No one could fairly conclude that Ms. Morerod's testimony at trial was incredible as a matter of law. She was emphatic that she saw Detective McKinley come to the house to measure the damaged door and she previously testified to the same thing when she saw Detective McKinley at White's criminal trial. It was up to the jury to determine whether Ms. Moreod was credible.

Further, there was other evidence from which the jury could infer that a relationship existed prior to the molestation allegations. According to Tina, in early March 1998, White checked messages at the White residence and heard a message from Jami warning Tina to "get rid of the guys before [White] comes home." Although Tina testified that Jami had been joking, Tina also testified that Jami did not usually joke about Tina being unfaithful to White.

In addition, White testified to a statement made by Tina indicating that she was involved in a relationship prior to the allegations. White testified that, in the fall of 1997, Tina told him she had kissed a fireman from Lee's Summit who had a motorcycle. Detective McKinley argues that it is speculation to infer that this statement referred to Detective McKinley, a Lee's Summit police officer who had a motorcycle. However, Detective McKinley's lawyers cross-examined White about this statement (Tr. 404), Tina denied that she made the statement about the firefighter (Tr. 1300-1302), and Detective McKinley's

Case 4:05-cv-00203-NKL    Document 417    Filed 03/26/09    Page 11 of 56

lawyers argued the weight of the evidence concerning the statement (Tr. 2043).[8]  While the statement standing alone might not establish that Tina was seeing Detective McKinley before the allegations of abuse, in conjunction with the testimony of Nina Morerod,  the jury could reasonably infer that the statement was referring to Detective McKinley and Tina slightly altered the facts to avoid identifying the person she actually kissed.  It was for the jury to weigh this evidence and from it could logically infer that Tina's relationship with White existed before the allegations of sexual abuse.

Finally, even if the jury found that the relationship began during the investigation and not before it, the jury could still have found that a constitutional violation occurred  A reasonable juror could conclude that Tina and Detective McKinley violated White's right to a fair trial when they told prosecutors that the relationship did not start until after the investigation was completed and that it only involved going out for a drink.  At the time these statements were made, Detective McKinley had already acknowledged that the relationship was sexual and had been told by the Chief of Police to end the relationship, a warning that Detective McKinley did not heed or report to the prosecutors.  Given these facts the jury

_____

[8]  At oral argument on his post-trial motions, Detective McKinley argues for the first time that the firefighter statement was only admissible as an admission by a co-conspirator if it was made in connection with the conspiracy; Detective McKinley claims that any such statement occurred before the alleged conspiracy began  and was, thus, inadmissible.  Detective McKinley did not raise this argument at trial – he cites to no place in the record where he did so – and he offered no limiting instruction with regard to the statement.  The statement is obviously admissible against Tina, and because Detective McKinley did not timely request a limiting instruction, this argument should be deemed waived.  Had the request been made at trial, the issue could have been expeditiously resolved.

might disbelieve Detective McKinley and Tina when they testified that the relationship began after the investigation was completed. Indeed, a review of Tina's and Detective McKinley's testimony at trial reveals so many statements that appear to be untrue, that a reasonable juror could not only discount Tina's and Detective McKinley's statements about when the relationship started, but conclude that their efforts to cover up the truth about the relationship was evidence of bad faith.

### (2) Detective McKinley's Interaction with Children

There was also evidence that Detective McKinley told the prosecutors that he had no personal involvement with Jami and Danny before trial. Prosecutor Mettler testified that Detective McKinley and Tina advised Prosecutor Mettler that the children had no idea that Tina was having a relationship with Detective McKinley. Prosecutor Mettler testified that they told her they used a code name - Curt - in speaking of Detective McKinley so that the children would not know the identity of the man Tina was dating.

However, Tina and Detective McKinley never advised Prosecutor Mettler that Detective McKinley was coming to the White residence, helping Jami with her homework, or helping Tina's son work on motorcycles prior to the first trial. Yet Tina's former co-worker testified that, before the first trial, Tina said her boyfriend, Curt Cox, was having a positive influence on her children, as he was helping the children with their homework and working on motorcycles with her son. The jury could reasonably infer that Tina was talking about Detective McKinley when she told the co-worker that her boyfriend was interacting

13

with her children. Jami also testified that she had sent a letter to a friend before the trial telling her that she had gone to "Curt's" house and picked out her room. The jury could conclude that Jami was talking about Detective McKinley, particularly because Detective McKinley and Tina moved in together shortly after the trial.

From this evidence, the jury could infer that Detective McKinley misrepresented the full nature and extent of his relationship with Tina to the prosecutors who could not, therefore, disclose the full nature and extent of the relationship to White for use in his defense. A prosecutor testified that had she known the extent of the full relationship between Detective McKinley and White's children before trial, she would have told White about it.

### (3)    Intent to Deprive White of Fair Trial

Further, there was evidence that Tina and Detective McKinley were plotting against White. Another former co-worker of Tina's testified that, before the first trial, Tina spoke of her boyfriend helping her to get rid of her husband; Tina told the co-worker that the boyfriend was a Lee's Summit police officer. Detective McKinley certainly did not disclose such a plot to the prosecutors so that White could use the information in his defense.

While Detective McKinley argues the weight of the evidence presented to the jury, the measure here is whether there was sufficient evidence from which a jury could determine – without resort to speculation – that Detective McKinley misrepresented to the prosecutors the full nature and extent of his relationship with Tina and her children, and whether that interfered with the prosecutor's ability to appropriately determine whether to disclose the

14

relationship to White. The record shows unequivocally that that evidentiary standard has been met.

### b. Diary

Detective McKinley argues that his conduct with regard to Jami's diary did not violate White's right to a fair trial for two reasons. First, he argues the diary was not exculpatory; but as the Missouri Court of Appeals, the Eighth Circuit and the trial evidence clarified, the diary was exculpatory. Second, he takes the position that he cannot be held liable because he disclosed the existence of the diary to the prosecutor and he didn't destroy the diary; but under the Eighth Circuit's holding, Detective McKinley is liable for failing to preserve the diary because the trial evidence showed he did so in bad faith.

### (1) Exculpatory Nature of Diary

First, Detective McKinley argues that the diary was not exculpatory on its face and, therefore, could not have been the basis for a finding of liability. While there was no evidence that the diary spoke directly to the allegations of molestation, there was evidence that the diary contradicted those allegations. White testified that he had seen the diary, that it said he was a good father, that it said Jami wanted to spend more time with him, and that it said that Jami wanted more attention from her mother. Such statements could be used for impeachment because Jami may have had a motive to fabricate the abuse allegations to gain her mother's attention or to please her mother. They also suggest a positive relationship with her father. This is confirmed by the Missouri Court of Appeals which held that the diary was

Case 4:05-cv-00203-NKL   Document 417   Filed 03/26/09   Page 15 of 56

exculpatory because it could be used for impeachment purposes. In addition, the Eighth Circuit said that "[f]ailing to preserve the diary deprived White of his right to a fair trial, in part, because he could not testify about the diary without waiving his right to testify." *White v. McKinley*, 519 F.3d 806, 814. In addition, the Eighth Circuit and Supreme Court have held that a due process violation occurs when a police officer suppresses in bad faith "potentially" exculpatory evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008); *Villasana v. Wilhoit*, 368 F.3d 976 (8th Cir. 2004). This standard recognizes the difficulty of establishing the exculpatory nature of evidence which has been suppressed in bad faith and is no longer available.

The jury also heard that, after the diary's disappearance was revealed to a criminal jury, White was acquitted. This could be considered as evidence that the unpreserved diary was exculpatory. *See Malone v. Walls*, 538 F.3d 744, 760 (7th Cir. 2008) (considering the acquittal of a defendant whose trial included exculpatory testimony as indicative that conviction of a co-defendant would not have occurred had the exculpatory testimony been included in his trial). Indeed, there was so much evidence that the diary was exculpatory that Detective McKinley's argument to the contrary is frivolous.

### (2)    Disclosure of Diary's Existence to Prosecutor

Next, Detective McKinley argues that he cannot be liable because he mentioned the existence of the diary in a report produced to the prosecutor. He seems to argue that it is okay to not preserve evidence even when done in bad faith, if he tells the prosecutor about

16

the existence of the evidence. Again, this argument is inconsistent with the Eighth Circuit's opinion in this case. The absence of the diary prevented its use for impeachment purposes and that problem was not solved by Detective McKinley telling the prosecutors about the diary. It was the absence of the diary that impaired White's due process rights not his failure to disclose its existence. Thus, the proper inquiry is whether Detective McKinley failed to preserve the diary and did so in bad faith.

It is undisputed that Detective McKinley did not preserve the diary even though he took exhaustive photos of Jami's room, her hobby horse, mirrors and door frames. A police practices expert testified that, under normal police practices, there would have been "no question or hesitation about collecting [the diary] as potential evidence." (Tr. 1920-22.) The Missouri Court of Appeals said that "one does not have to be in law enforcement to know that it would not be routine to review the diary and then return it to the complaining witness." *State v. White*, 81 S.W.3d 561, 569-70. Even Detective McKinley testified that, in a sexual abuse case, it is "obvious" that a diary should be taken into custody. Jami testified that Detective McKinley took some time to read the diary, and that she did not recall seeing it again after Detective McKinley had his hands on it. Detective McKinley concedes it disappeared but claims he left it at the White house. The jury was not required to find that a report mentioning the diary negates the possibility that Detective McKinley failed to preserve the diary in bad faith.

17

As to Detective McKinley's argument that there had to be evidence that he destroyed the diary, neither the Missouri Court of Appeals or the Eighth Circuit held this was necessary for a Brady violation to have occurred. This is particularly so given that the exculpatory evidence, even according to Detective McKinley, was left in the home of the complaining witness. *See State v. White*, 181 S.W.3d 567, 569-70 (2006).

### c.      Pre-CPC Interview[9]

Detective McKinley argues that the pre-CPC interview cannot form the basis of White's § 1983 claim because neither this Court nor the Eighth Circuit specifically considered it when Detective McKinley's Motion for Summary Judgment was ruled. While the Eighth Circuit expressly addressed Detective McKinley's relationship with Tina and the diary, its ruling in no way dictated that those two items were the only potential bases for White's claim that Detective McKinley suppressed and failed to preserve evidence. The Eighth Circuit stated, "[A] reasonable juror could find Richard deprived White of a fair trial in bad faith by deliberately steering the investigation to benefit [Richard's] love interest, Tina." *White*, 519 F.3d at 814. Thus, other evidence that Detective McKinley suppressed evidence to benefit his love interest with Tina is also properly considered. *See Pediatric Specialty Care, Inc. v. Arkansas Dept. of Human Servs.*, 364 F.3d 925, 931 (8th Cir. 2004) (stating that the district court is free to decide any issue not disposed of on appeal).

---

[9]The Court assumes that Detective McKinley made an error in the heading of his argument when he suggested that prosecutors were aware of his pre-CPC interview. There is no such evidence and no good faith basis for arguing that such evidence existed.

18

White introduced evidence that Detective McKinley met with Jami prior to her CPC interview. In the transcript of her CPC interview, Jami stated that, before the CPC interview, a "detective" spoke to her about the molestation allegations. Detective McKinley testified that he was the only detective who had been assigned to the case at the time of the CPC interview. Even Detective McKinley does not argue that there is insufficient evidence that this meeting occurred.

There is also evidence that a pre-CPC interview by law enforcement would have been improper. Detective McKinley admitted that he knew such a meeting would be seriously improper; he admitted that the CPC used trained interviewers and recordings because children are susceptible to leading which can produce inaccurate testimony. Prosecutor Kanatzar testified that she would expect an officer to document any contact with an accuser in a police report. The police practices expert confirmed both Detective McKinley and Prosecutor Kanatzar's testimony in this regard. (Tr. 1916-1920.) The record shows that Detective McKinley never disclosed the pre-CPC interview to prosecutors. Detective McKinley simply denied that the interview occurred. The pre-CPC interview would be evidence favorable to White's defense and a jury could find that it was material, particularly in light of Detective McKinley's relationship with Tina and the fact that children are easily led if interviewed before an expert can do an evaluation. *See generally United States v. Bagley*, 473 U.S. 667, 676 (1985) (holding that exculpatory evidence includes impeachment evidence).

It was for the jury to make a determination about the weight of the pre-CPC interview evidence and the credibility of the witnesses who testified about that meeting. As for the issue of qualified immunity, Detective McKinley is correct that there is no case which says that a police officer should not knowingly violate department policy and police practices by interviewing an alleged victim of sexual abuse and then in bad faith fail to disclose that interview to the prosecutor. On the other hand, in *White v. McKinley*, 519 F.3d 806 (8th Cir. 2008), the Eighth Circuit held that White could recover if a reasonable juror "could find that Richard deprived White of a fair trial in bad faith by deliberately steering the investigation to benefit his love interest." *Id.* at 814. It specifically noted that there did not have to be a case on point since no reasonable officer could conclude that he could deliberately withhold potentially exculpatory evidence from a prosecutor in bad faith. Because the evidence of the pre-CPC interview is exculpatory, and a reasonable juror could conclude it was deliberately not disclosed to the prosecutor in bad faith, Detective McKinley does not have qualified immunity on this issue.

### 2. Bad Faith Generally

Detective McKinley argues that there was insufficient evidence of bad faith to submit the issue to the jury. He argues the evidence of bad faith as to each individual item of potentially exculpatory evidence – the relationship, the diary, and the pre-CPC Interview – suggesting that the jury was required to consider his intent as to each item by considering only evidence pertaining to that item.

However, the jury was entitled to consider the totality of the evidence in determining whether Detective McKinley was acting in bad faith when he deprived White of a fair trial, and there was significant evidence of bad faith. As to each item, there was evidence that Detective McKinley violated generally accepted practices or his department's express policy. *Cf. Villasana v. Wilhoit*, 368 F.3d 976 (8th Cir. 2004) (finding no evidence of bad faith where investigators sent lab reports to the prosecutor in compliance with agency policy). There was also evidence that Detective McKinley purposefully avoided interviewing White contrary to generally accepted practices. The jury could reasonably infer improper motive where an experienced police detective consistently violated accepted practices and policy in one particular case, especially in light of his motivation for steering the investigation.

There was also other evidence of bad faith. There was evidence indicating that Detective McKinley, in an attempt to embarrass White, insisted on arresting White rather than allowing surrender. There was Tina's admission that her police-officer boyfriend was helping her to get rid of her husband and the lack of any reasonable explanation for photographing in detail the interior of the White's house but failing to seize the diary. The jury, listening to Tina and Detective McKinley's testimony, could believe that they were not telling the truth at trial and that there was a financial and personal motivation for steering the investigation so White would be convicted . The jury could reasonably infer that Detective McKinley was purposely trying to hide evidence favorable to White.

21

### 3. Conspiracy

Detective McKinley argues that no reasonable jury could find that he conspired with Tina to deprive White of a fair trial. The Court disagrees. The jury was instructed that, in order to find a conspiracy, it had to find that:

(1) Detective McKinley and Tina reached an agreement to either fail to disclose, or cause the prosecutors to fail to disclose, or fail to preserve, evidence material to White's criminal defense;

(2) Detective McKinley and Tina took such actions in bad faith;

(3) either Detective McKinley or Tina took an action in furtherance of their agreement; and

(4) that their agreement and one or more of their actions injured White. [Doc. # 348, Instr. 16.]

### a. Agreement

First, Detective McKinley argues that there was no evidence of agreement. The jury was free to infer agreement from the circumstantial evidence presented at trial. As discussed above, that included the evidence that Detective McKinley – an experienced detective investigating sexual abuse cases – repeatedly disregarded accepted practices and department policy in conducting the investigation (the pre-CPC interview, the diary, and the

22

relationship). There was also testimony indicating that Detective McKinley disregarded accepted practices by not following up on White's offer to give a statement and by lying about the circumstances of White's arrest. There was evidence that the relationship existed before the investigation was completed and that Detective McKinley and Tina lied about this to prosecutors. There was evidence of a financial motive to have White convicted of a felony. One of Tina's co-workers offered testimony indicating that Tina bragged that she and Detective McKinley were going to get rid of White. *See White*, 519 F.3d at 816 (noting that the elements of a conspiracy are rarely established through means other than circumstantial evidence). This circumstantial evidence - combined with the jury's credibility determinations of Detective McKinley's and Tina's testimony and previous inconsistencies in their statements - provided a sufficient basis for a finding that there was an agreement.

### b.    Act in Furtherance

Detective McKinley argues that there was no evidence of an act in furtherance of a conspiracy. The evidence regarding the lying about the relationship, failing to preserve the diary, and the pre-CPC interview alone is more than adequate for a finding of an act in furtherance. In addition, there was evidence from which a reasonable juror could conclude that Detective McKinley, under oath, misled White's lawyer about Detective McKinley's interest in the investigation: at a time when he was having a full-blown affair with Tina, Detective McKinley stated that he had no personal interest in the investigation.

### 4.    Conclusion

Drawing all reasonable inferences in favor of White, the Court must deny Detective McKinley's motion for judgment as a matter of law. There was evidence from which a jury could find for White – without speculation – on both his § 1983 and conspiracy claims.

**B.    Motion for New Trial**

Detective McKinley argues that he is entitled to a new trial or amended judgment because the Court's evidentiary rulings – as opposed to the evidence – improperly influenced the jury's verdict. "A motion for a new trial based on erroneous [evidentiary rulings] should not be granted unless the evidentiary ruling[s] [were] so prejudicial that a new trial would likely produce a different outcome." *Radloff v. City of Oelwein, Iowa*, 380 F.3d 344, 349 (8th Cir. 2004) (citation omitted). "On a motion for new trial, the district court is entitled to interpret the evidence and judge the credibility of witnesses, but it may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable." *Van Steenburgh v. Rival Co.*, 171 F.3d 1155, 1161 (8th Cir. 1999) (citation omitted).

A movant may not use a motion for a new trial "to introduce new evidence, tender new legal theories, or raise arguments that could have been offered or raised prior to entry of judgment." *Parton v. White*, 203 F.3d 552 (8th Cir. 2000) (citation omitted). The movant must "specifically identify the alleged erroneous ruling and the improperly excluded

24

evidence." *Moses.com Sec. Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1059 (8th Cir. 2005) (citations and internal quotations omitted).[10]

### 1.    Evidence of Guilt

The refrain of Detective McKinley's motion for a new trial is that the Court unfairly denied him the opportunity to prove that White was guilty of the molestation allegations. At the outset of trial, the Court found that White's guilt or innocence in the criminal trials was not relevant to the ultimate issues of this case of whether Detective McKinley, in bad faith, deprived White of a fair trial and conspired with Tina to do so. In the United States, even the guilty are entitled to a fair criminal trial. *Kempe v. U.S.*, 151 F.2d 680, 690 (8th Cir. 1945). Allowing evidence of innocence and guilt absent some purpose directed to the issues in this case would have created a mini-trial (and several sub-mini-trials) on the issue of whether White was guilty of molestation.

Where evidence tending to show White's guilt or innocence was probative of another issue in the case, the Court considered whether that evidence was admissible. Several pieces of evidence and argument pointing toward White's innocence came before the jury because they were admissible, not to establish innocence but for other purposes. The Court also excluded several pieces of evidence tending to show White's innocence (evidence that Jami changed her story over time, evidence that Jami's brother contradicted her story and that Tina

---

[10]    Detective McKinley fails to cite to the record for several of his arguments. The Court has endeavored to locate support for his arguments in the record, and will only note his omission where it appears he waived an argument by not giving the Court an opportunity to address it at trial.

25

and Detective McKinley may have interfered with Jami's brother's testimony, medical evidence that Jami showed no physical signs of trauma despite allegations which would have indicated to the contrary, and expert opinion that Jami's stories had hallmarks of undue influence by Detective McKinley and Tina).

The Court allowed introduction of several pieces of evidence and argument pointing toward White's guilt, several slipped in without objection by White, and several came in when Detective McKinley's attorneys violated the Court's orders. The Court excluded several pieces of evidence tending only to show White's guilt, including police reports from Detective McKinley and other officers, medical reports concluding that Jami had been molested, Jami's CPC interview, testimony about potential physical evidence of molestation, testimony that White had propositioned a fourteen-year-old babysitter some time before the allegations, and testimony that prosecutors believed White was guilty.

In addition to the evidence discussed separately in his motion for a new trial, Detective McKinley is generally concerned with two particular statements. He is concerned that White testified that "the truth surfaced" at the second trial. The Court did sustain Detective McKinley's attorney's objection to the ambiguous statement (which could have referred to the "truth" about Detective McKinley and Tina's conduct), and instructed the jury that the case was not about whether White was guilty or not guilty. Detective McKinley is also concerned about White's attorneys' argument that, at the second trial, the one holdout juror "closed [his] mind[] and wouldn't deliberate," as indicating that White was not guilty

26

of molestation.  Again, the Court sustained Detective McKinley's attorney's objection to the statement.

Detective McKinley seems to argue that, because the Court found so much of White's evidence admissible, it was fundamentally unfair for the Court not to balance that admissible evidence with the inadmissible evidence proffered by Detective McKinley.  However, it was up to Detective McKinley to develop his own defense with relevant, admissible evidence and persuasive argument.  The Court will next discuss the specific evidentiary rulings which Detective McKinley raises in his Motion for New Trial.

### 2.  Costa Rica

Detective McKinley argues that he should have been permitted to introduce evidence that White would have spent very little time, if any, incarcerated had he not fled to Costa Rica.[11]  Detective McKinley notes that Missouri law permits criminal defendants to remain out on bond pending appeal and claims that had White not fled, he would have been on bond until his appeal was finally resolved.  Based on this argument, Detective McKinley moved to exclude any evidence of White's incarceration in Costa Rica or Missouri because it was speculation to assume what would have happened had White not fled.  White argued that

_____

[11]  Detective McKinley also argues that White's conviction would have been reversed sooner had White not fled.  According to Detective McKinley, White's lawyers learned of the relationship between Detective McKinley and Tina within a few weeks of White's flight; Detective McKinley argues that the lawyers could not take any action on the information – such as request a new trial or remain out on bond pending appeal – because White was a fugitive whose whereabouts were unknown.  Detective McKinley did not raise this argument at trial and does not include a cite to the record where he contends that he did.  This is so even though the issue of Costa Rica was discussed at great length both pretrial and during the trial.

27

evidence of all of White's incarceration was relevant to damages. He argues prison is the natural consequence of depriving someone of a fair trial and, therefore, he should be permitted to recover for the injuries he sustained as a result of the very harsh conditions of a Costa Rican jail.

The Court excluded evidence of White's Costa Rican incarceration, and allowed evidence of White's incarceration in the United States. The Court considered the probative value versus the prejudicial impact of flight and Costa Rican prison conditions, as well as the collateral nature of evidence that White would not have been incarcerated absent the flight. While the Court determined that a jury could not find that Costa Rican prison conditions were a foreseeable result of an unfair trial, the Court also found that it was speculation to say that White would not have been incarcerated in the United States absent his flight, particularly in the absence of testimony by White's criminal trial judge, or comparable rulings in any Missouri court, or expert testimony.

In Detective McKinley's offer of proof, Detective McKinley indicates that he would have offered the following on the issue of whether White would have been incarcerated absent his flight: White's testimony that he fled following his conviction and before sentencing in the first criminal trial; the Missouri Court of Appeals opinion; testimony from White's criminal defense attorney that he would have requested White remain free on bond pending appeal had White not fled; and testimony "about the likelihood that [White] would not have been incarcerated and free on bond following the Missouri Court of Appeals

reversal of [White's] criminal conviction on April 30, 2002. Further testimony that the appellate opinion . . . would have been issued earlier in time but for [White's] voluntary flight to Costa Rica." [Doc. # 358 at 1-2.]

First, Detective McKinley does not describe what this latter "testimony" would have been, or who would have testified on the topic. Other than attempting to ask White's defense attorney whether he would have attempted to keep White out of jail pending appeal – in violation of the Court's in limine order – Detective McKinley did not offer such evidence at any point leading up to or during trial. Detective McKinley offered, and still offers, no actual evidence – expert or otherwise – that White, a convicted child molester, would have been released on bond pending his re-trial. Once the Court ruled the issue, Detective McKinley did not even seek leave to find such evidence. Nor does his offer of proof identify with any specificity the evidence which would show he would have been released on bond. This is so even though the Court gave Detective McKinley extra time after trial to make his offer of proof.

Jurors are not expected to know the intricate workings of the criminal justice system; they would have needed evidence to help them determine: (1) whether bail was available following conviction, (2) how bail would have been assessed in the trial judge's discretion, (3) how the specific factors of White's alleged crime would have influenced bail decisions,[12]

_____

[12] At least as to the time period following White's conviction, Section 547.170 of the Missouri Revised Statutes indicates that bail was not available, as White was convicted of a sexual offense where the victim was less than seventeen years of age. Detective McKinley's attorney never distinguished at trial between release following reversal and release on bond

(4) whether White would have received a bond at any particular point, (5) the amount of that bond, and (6) whether there was money for the bond. Because Detective McKinley did not provide a non-speculative foundation for admission of the flight, it was inadmissible under Rules 104(b), 401, 402, and 403 of the Federal Rules of Evidence. *See Murphy v. Missouri Dept. of Corr.*, 506 F.3d 1111, 1116 (8th Cir. 2007).

At the request of Detective McKinley, the Court prevented the Plaintiff's testimony about prison conditions in Costa Rica. Thus, the Court ensured that neither side would benefit from the Costa Rica detour.

### 3. Prior Trials

Detective McKinley argues that the Court should not have admitted evidence that White's second trial resulted in an eleven-to-one hung jury, and that his third trial resulted in acquittal. Detective McKinley relies on cases stating that evidence of acquittal is not admissible to establish innocence or as collateral estoppel in a later case. However, evidence of acquittal is admissible for other purposes. *See, e.g., Monteiro v. City of Elizabeth*, 436 F.3d 397, 406 (3d Cir.) (finding that the district court did not abuse its discretion in allowing evidence of acquittal to show damages), *cert. denied sub nom, Perkins-Auguste v. Monteiro*, 549 U.S. 820 (2006); *Nance v. Vieregge*, 147 F.3d 589, 591 (7th Cir. 1998) (indicating that evidence of acquittal would be admissible to establish damages for wrongful incarceration in denial of access to courts claim); *Sloman v. Tadlock*, 21 F.3d 1462, 1472 (9th Cir. 1994)

---

pending appeal.

(finding that evidence of acquittal was properly admitted to establish damages regarding cost of defending improper criminal charges).  Here, the Court admitted the evidence of the acquittal and the hung jury, finding it relevant to the issues of damages and causation; i.e., whether exculpatory evidence "would have put the case in a different light so as to undermine confidence in the outcome." [Doc. # 348, Instr. 15, 16.]  The jury could consider the fact that the one criminal jury that did not hear the undisclosed/unpreserved evidence convicted White, whereas the two criminal juries who heard it did not.[13]

In response to the evidence of the hung jury and the acquittal, Detective McKinley attempted to show that White's second and third trials had outcomes different than the first for reasons other than the newly-admitted evidence concerning the relationship, diary, and pre-CPC interview.  For example, he introduced evidence and argued that White had a better legal team for those trials than he did for the first and those trials took substantially longer.  The jury was allowed to consider this evidence.  Yet Detective McKinley's counsel did not devote as much time to developing the evidence helpful to him as he did to arguing about excluding evidence helpful to White.

The Court specifically invited Detective McKinley to submit a limiting instruction on the issue of the hung jury and acquittal.  He did not submit such an instruction in writing, and points to no portion of the record where he contends he made a verbal request for such an

---

[13]  Evidence of the second and third trials was also generally relevant to the issue of damages:  the jury could infer that, had White received a fair trial in the first instance, he would not have had to undergo the second and third trials or incur related fees.

Case 4:05-cv-00203-NKL   Document 417   Filed 03/26/09   Page 31 of 56

instruction. To the extent Detective McKinley is concerned that the jury considered the hung jury and the acquittal as evidence that White was innocent of molestation, the Court made it clear that that issue was not before the jury. (Tr. at 347.)

### 4. Testimonial Immunity

Detective McKinley argues that the Court erred by not recognizing that he had testimonial immunity with regard to incomplete or false statements he gave during a deposition in the criminal proceedings. In support of this argument, Detective McKinley cites to a § 1983 case where a police officer was found to have immunity where a plaintiff sought damages for the officer's perjured statement. *See Briscoe v. LaHue*, 460 U.S. 325 (1983). Here, White did not seek damages based on perjured testimony; he sought damages based on an alleged bad faith withholding of potentially exculpatory evidence. *See Manning v. Miller*, 355 F.3d 1028, 1033 (7th Cir. 2004) (stating that *Brady* claim encompassing false testimony was not impermissible run around testimonial immunity where claim went well beyond that testimony itself). The Court allowed White to question Detective McKinley regarding the deposition testimony as it was relevant to whether Detective McKinley was acting in bad faith with regard to disclosing the relationship. (Tr. at 486- 490).[14]

_____

[14] The Court, however, did not allow Prosecutor Mettler to offer a prohibited opinion on Detective McKinley's credibility; though, at one point in closing argument and in violation of the Court's order, White's attorney used the word "perjury" in reference to Detective McKinley's deposition testimony, the Court sustained Detective McKinley's attorney's objection.

32

Detective McKinley also argues that the Court should have admitted testimony from Prosecutor Mettler that, after Detective McKinley's deposition, he asked Prosecutor Mettler whether he had testified correctly and Prosecutor Mettler stated that he had done so. (Tr. 1714 (emphasizing, on questioning by the Court, that this was Detective McKinley's argument regarding Prosecutor Mettler's testimony on Detective McKinley's deposition)).

Detective McKinley testified at length concerning his deposition testimony; he testified that it was truthful and offered an explanation for how it could be interpreted as such; his lawyer argued his explanation in closing. (Tr. at 576-589, 1677-86, 1692-94, 1784-85, 2035-36.) To the extent that Detective McKinley, albeit ineffectively, intended to argue that his very questioning of Prosecutor Mettler about whether his testimony was appropriate showed that he was not acting in bad faith, refusal to admit evidence of the questioning via Prosecutor Mettler does not warrant a new trial, given the substantial evidence of bad faith in this case and the ambiguous inference that could be drawn from Detective McKinley's inquiry. Even if such evidence had been admitted, there is no reasonable likelihood, given the testimony of Tina and Detective McKinley, that the outcome of this case would have been different.

### 5. Investigation

Detective McKinley complains that he was entitled to introduce evidence of the entirety of the investigation to demonstrate the thoroughness and quality of the investigation. However, Detective McKinley sought only to introduce the substance of the evidence his

33

investigation revealed, not the protocols he followed or the steps he took in completing the investigation. Detective McKinley, in essence, argues that, because the jury was not permitted to hear evidence that White was guilty of molestation, the jury could *only* infer that Detective McKinley acted in bad faith. Detective McKinley asserts that "each and every aspect of [his] investigation should have been presented to the jury so they could make the ultimate determination as to whether the investigation was good, bad, or somewhere in between." [Doc. # 369 at 16.] This clarifies Detective McKinley's fundamental misunderstanding of the case. White may have been guilty and Detective McKinley may have conducted an otherwise acceptable investigation, but if he deliberately suppressed or failed to preserve specific evidence in bad faith, he violated White's right to a fair trial. The fact that Detective McKinley thoroughly investigated Jami's complaint does not indicate that he had a good faith reason for not securing the diary or failing to reveal to the prosecutor his true relationship with Tina. Evidence that Detective McKinley revealed other exculpatory proof would logically show that his omission as to the diary, relationship and PCP exam was unintentional; but doing a good job to find evidence that tended to prove White's guilt does not.[15] Indeed, showing that he conducted a thorough investigation, except for leaving the diary with the complaining witness, failing to document pre-CPC interview and making misleading statements about his relationship with Tina, would tend to show he was acting

---

[15] When questioned by the Court, Detective McKinley's attorney specifically stated that he did not seek to introduce evidence of his investigation to establish that Detective McKinley had so much evidence of guilt that he did not take the diary into custody because it was merely cumulative.

in bad faith, not good faith; i.e., he knew how to conduct a thorough exam but chose not to when it came to exculpatory evidence.

Finally, the inflammatory and collateral nature of the investigation evidence – which was, in essence, evidence of White's guilt – would have far outweighed any probative value in showing that Detective McKinley's investigation was thorough.

### a.    Arrest

Detective McKinley complains that the Court should not have permitted White to introduce evidence concerning Detective McKinley's arrest of White at his workplace, especially because the Court did not permit Detective McKinley to introduce all the evidence gathered in the investigation. The Court admitted that evidence as relevant to bad faith: White's contention was that Detective McKinley normally would allow a defendant to surrender but arrested White instead, in a malicious effort to embarrass him. There was testimony indicating that White's criminal attorneys had made arrangements for White to surrender voluntarily. There was testimony indicating that Detective McKinley may have lied to his sergeant about whether Detective McKinley arrested White, or whether White surrendered. Detective McKinley had the opportunity to present evidence addressing whether the arrest was proper and typical, but he did not. The manner in which Detective McKinley interacted with White on the one occasion when they had face-to-face contact was relevant to whether Detective McKinley acted in bad faith.

### b.    Fourteen-year-old Babysitter

35

Detective McKinley complains that the Court excluded evidence that, years prior to the molestation allegations, White asked a fourteen-year-old babysitter to kiss him. Because White denies the incident and several witnesses were involved, this issue presented another opportunity for a mini-trial on whether the event actually occurred. It is also only relevant to the issue of guilt or innocence.[16] More importantly, the evidence is excludable because proof of proclivity is not generally admissible under the Federal Rules of Evidence.

Detective McKinley argues that the evidence should have been admitted under Rule 415 of the Federal Rules of Evidence (stating that evidence of a civil *defendant's* prior commission of *sexual assault* or *child molestation* may be considered). The Court is unwilling to extend that Rule - intended to protect sexual assault victims - so as to allow testimony of a *plaintiff's prior misconduct in a case alleging police misconduct.* Particularly in a case in which the plaintiff's guilt or innocence is not relevant to the ultimate issues. *See generally Berry v. Oswalt*, 143 F.3d 1127 (8th Cir. 1998) (finding, in § 1983 case of sexual harassment against correctional officer, that evidence of officer's treatment of other inmates was inadmissible). This highly-inflammatory testimony has little, if any, probative value on any issue other than White's guilt, and under the Federal Rules of Evidence, it is not even

---

[16] Detective McKinley now attempts to argue - as he did not at trial – that the babysitter evidence is relevant to show that any of his alleged shortcomings were understandable in light of the significant evidence of guilt. The Court carefully considered the arguments Detective McKinley did make about admissibility of the evidence, and even considered changing its ruling after trial had commenced, but Detective McKinley specifically disavowed the argument he now makes.

36

admissible to show guilt when it is being offered against a plaintiff in a case involving police misconduct.

### c.     March 8

Detective McKinley argues that the he should have been permitted to introduce evidence that White molested Jami on March 8, 1998, a date on which Jami alleged molestation and for which White claimed an alibi.  Specifically, Detective McKinley asserts that he should have been allowed to introduce evidence that Nina Morerod found blood on Jami's panties the following day.  White disputed this evidence, indicating there was evidence that Morerod was unsure of the date, that the blood spot may have been the result of an infection for which Jami had been treated, that adolescent Jami had complained of stomach cramps in that time frame and may have started her period, and that spotting was not consistent with the abuse which allegedly occurred on March 8.  Detective McKinley offered this evidence to establish "the truth of what Jami [alleged]."  (Tr. at 1002.)

While not allowing the inflammatory details, the Court did admit evidence that Jami said she had been abused by her father on March 8.  The Court also permitted evidence that Tina knew White had an alibi for that date, which tended to explain why Detective McKinley avoided interviewing White; *i.e.*, he did not want to include in the file a verifiable alibi for March 8, because that would undermine the strength of his case against White.

Case 4:05-cv-00203-NKL   Document 417   Filed 03/26/09   Page 37 of 56

The Court also admitted testimony which permitted the jury to draw inferences in favor of Detective McKinley concerning the March 8 allegations. Tina testified that White was at home alone with Jami on that day. One of White's alibi witnesses testified on cross-examination that there was a time period on March 8 when the witness did not know of White's whereabouts, and Detective McKinley's attorney argued at closing that White was alone with Jami on that day, bolstering Jami's credibility.

As Detective McKinley did not demonstrate that the blood spot evidence was relevant to anything other than guilt, the Court did not allow the evidence.

### 6. Prosecution

Detective McKinley argues that the Court should have allowed the prosecutors involved in White's criminal trials to testify about the evidence on which they relied, their follow-up investigations, and their position with regard to disclosing the relationship between Tina and Detective McKinley. Specifically, Detective McKinley contends the Court should have admitted the following evidence regarding the prosecutors: (1) what the prosecutors relied on to prosecute White; (2) the probable cause statements of Prosecutor Kanatzar; (3) testimony that the ability of the prosecutors to prove their case beyond a reasonable doubt depended on Jami's testimony and that of the CPC doctor; (4) testimony that Prosecutor Mettler personally interviewed a number of witnesses and learned of facts not included in Detective McKinley's investigation including the pending divorce between White and Tina as well as additional facts which Detective McKinley did not uncover; (5) testimony that the

38

prosecutors did not believe the relationship was exculpatory; and (6) testimony that it was the prosecutor's fault that the relationship was not disclosed to White. Though he lists evidence he would have liked to introduce, he does not indicate which Court rulings prevented that evidence, nor does he articulate a basis for admissibility of that evidence. The Court does not recall some of this evidence ever being mentioned and cannot locate its mention in the transcript or pretrial proceedings.

Assuming Detective McKinley has not waived some of his arguments concerning the prosecution evidence, the Court will address the evidence about which he complains in turn. (1) The prosecutors' opinions about Detective McKinley's credibility: this is simply not an appropriate subject for any witness to testify about. (2) The prosecutors' testimony concerning probable cause: probable cause was not relevant after the Court granted summary judgment to Detective McKinley on that issue. (3) The prosecutors depending on testimony from Jami and the CPC doctor: Detective McKinley articulated no basis for admitting testimony concerning whether the prosecutors believed White was guilty. It is reasonable to assume that a juror would conclude that if a prosecutor decides to prosecute a defendant, she believes the defendant to be guilty. However, the prosecutor's belief that White was guilty is not relevant to whether Detective McKinley withheld exculpatory evidence in bad faith. (4) Additional facts learned by the prosecutors: the Court did not preclude Detective McKinley from introducing evidence that the prosecutors knew of the divorce; Detective McKinley's argument concerning "other facts" does not provide a basis from which the Court

39

can identify any ruling excluding Detective McKinley's desired evidence. (5) The prosecutors' belief concerning the exculpatory nature of the relationship: Detective McKinley does not indicate what probative value there would be in testimony that Prosecutor Mettler, in her response to White's motion for new trial after his conviction, believed the diary and the relationship were not exculpatory – especially absent evidence that Prosecutor Mettler had considered the full extent of the relationship. (6) The prosecutor's decision not to disclose the relationship: the Court did allow Prosecutor Mettler to testify that she made the decision not to disclose the relationship to White; she stated this decision was based on her understanding that the relationship did not pre-exist Jami's allegations.

Though Detective McKinley's argument implies that the Court did not allow any evidence of the prosecution, the Court did allow Detective McKinley to introduce prosecutorial evidence which was probative of the issues in this, as opposed to the criminal case. Furthermore, even if the excluded evidence had come in, the Court does not believe it would have changed the outcome of the case. The prosecutors did not know all the evidence submitted in the civil case and Detective McKinley's and Tina's testimony was sufficiently unbelievable that a jury would have found bad faith even if the prosecutors had been allowed to testify about their belief that the evidence was not exculpatory, particularly in light of the Missouri Court of Appeals opinion.

### 7.    Detective McKinley's Role

Detective McKinley appears to argue that the Court erred by rejecting evidence of an "inter-agency agreement" which limited Detective McKinley's role in the investigative process. Detective McKinley does not indicate where in the record this occurred. Assuming that Detective McKinley did offer such evidence and the Court excluded it, such a ruling was appropriate. Detective McKinley seems to be re-arguing the issue of qualified immunity: he cites *Clemmons v. Armontrout*, 477 F.3d 962 (8th Cir. 2007), a qualified immunity case decided before the Eighth Circuit's decision in this case. Moreover, no reasonable police officer could believe that he had a right to withhold or fail to preserve evidence in bad faith because he had a limited role in an investigation – in fact, just the opposite.

### 8. Financial Motivations

Detective McKinley argues that the Court erred by excluding evidence of the value of certain assets years after the events in question in this case. White introduced evidence that, prior to the molestation allegations, Tina stood to benefit financially from White being convicted of a felony: there was evidence indicating that certain stock belonging to White would transfer to Tina if he were convicted of a felony, and evidence that the Whites had an extravagant lifestyle prior to the allegations. Detective McKinley sought to introduce evidence of the value of the stock at the time it was sold and evidence of the value of the White's marital estate at the time their divorce became final. Both pieces of evidence reflected value years after the allegations were made. The Court excluded this evidence because it was not probative of whether, at the time of the allegations, there was a financial

41

motive for withholding evidence that would be helpful to White's defense; Detective McKinley states no other basis on which his proffered evidence would be relevant.

### 9. Marital Discord

Detective McKinley argues that the Court should have allowed Tina to testify to the reasons why her marriage to White failed. The Court specifically deferred ruling on whether it would allow defense counsel to inquire into the area when Tina was on the stand. Detective McKinley does not include a cite to the record where he attempted to elicit such testimony from Tina.

However, because the issues presented another opportunity for a series of tangential, inflammatory mini-trials of limited probative value, the Court did exclude evidence of White's gambling, drug and alcohol use.[17] Even if White's prior bad acts should have been admitted, the exclusion of this evidence does not warrant a new trial. Given the other evidence in the case, there is no reasonable likelihood the result would be different.

### 10. Special Interrogatories

Detective McKinley argues that the Court should have submitted to the jury the special interrogatories which were proposed by Detective McKinley. [Doc. # 308 at 75.] The interrogatories are attached to this Order. The Court rejected the proposed

---

[17] Detective McKinley complains that White was permitted to testify that the marriage dissolved because of Tina's greed and infidelity, but White's testimony concerning infidelity was limited to that of the firefighter statement. Other than his objection to the firefighter statement – which was relevant to the issue of whether the relationship preexisted the allegations – Detective McKinley does not indicate where he objected to White's testimony in this regard.

42

interrogatories because they either request factual findings on issues that are not relevant; *e.g.* guilt or innocence, or are confusing *(e.g,* "Do you believe that Plaintiff Theodore White did not sexually abuse Jami because of information that would have been in Jami's diary."). They would also tend to mislead the jury about the proper findings required to return a verdict for Plaintiff or Defendants. Moreover, Detective McKinley does not point to any error in the verdict directing instructions that make these special interrogatories needed for clarification. Finally, he does not show how these interrogatories were needed to present his qualified immunity defense. The jury could not have found in favor of Plaintiff unless it concluded the Defendants acted in bad faith. There is no qualified immunity defense if Detective McKinley acted in bad faith.

### 11. Trial Court Bias

Detective McKinley argues that he is entitled to a new trial because the Court was biased against him. First, Detective McKinley is concerned that the Court admonished his counsel in front of the jury. At voir dire, outside the hearing of the jury, the Court told Detective McKinley's lawyer not to ask questions regarding maintenance of diaries; he appeared to be educating the jurors about the case rather than identifying information to use for peremptory strikes or strikes for cause. The Court had previously told the parties not to use voir dire to advocate their case; rather questioning should focus on selecting an unbiased jury. The Court gave Detective McKinley's lawyer some latitude but even after a side bar admonishing the lawyer to stop, he continued to inquire into areas that a reasonable lawyer

43

would have known were improper based on the Court's prior rulings. Attorneys instructed in the past under similar circumstances have had no difficulty understanding the Court's direction. The Court eventually admonished Detective McKinley's lawyer in front of the jury. (Doc. # 373, Tr. at 105-108.) During opening statements, the Court sustained multiple objections that Detective McKinley's lawyer was offering argument, yet he continued to do so. It was the Court's strong opinion that he was intentionally ignoring the Court's rulings, making argument immediately after the Court's ruling sustaining the Plaintiff's objection. He simply breezed by the Court's ruling and continued to make obvious argument. Eventually, the Court precluded such improper conduct by stopping his opening statement near its conclusion, hoping to get control of the attorney at an early stage of the trial.

Further, Detective McKinley is concerned that the Court found his lawyer in contempt. As to the first finding, the Court did so based on Detective McKinley's lawyer's repeated speaking objections. (Tr. 856-908.) All parties had been told before trial not to make speaking objections and the Court did not hold Detective McKinley's lawyer in contempt until he had violated the rule several times. Detective McKinley admits that the first finding of contempt was "arguably" justified. The second contempt finding was based on a "pleading poverty" objection. The Court invited Detective McKinley's lawyer to produce a good faith basis for that objection and stated that it would reconsider the contempt finding if he did so (Tr. at 908); he did not and has not. The third contempt finding was based on Detective McKinley's lawyer ignoring the Court's prior evidentiary rulings. (Tr. at

44

1818.)  The fourth contempt finding was for asking a specifically-prohibited question.  (Tr. at 1857.)  "Adverse rulings alone do not constitute personal bias and prejudice."  *Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1330-31 (8th Cir. 1985) (citation omitted).  If anything, the Court was too lenient with Detective McKinley's attorney given his continued willingness to violate the Court's orders.  It would be ironic if a lawyer could persistently misbehave and then accuse the Court of bias because attempts were made to stop the misconduct.

In addition, Detective McKinley claims that unidentified persons reported to him that Court visibly "teared up" during White's testimony.  Detective McKinley points to no place in the transcript where his attorney made a contemporaneous record on this allegation.  The reason attorneys are required to make a contemporaneous record is to prevent unfounded allegations being made after the fact, placing the court in a factual dispute with the parties.  If permitted, this would be a way to derail a trial that was not going well for one of the parties.

Moreover, to ensure that a judge's conduct in the courtroom does not affect a jury's verdict, the jury is instructed not to consider anything that a judge may say or do as indicating what the judge thinks of the evidence or what the judge thinks the verdict should be. (Instructions 1, 10 and 19 are attached to this Order).  These instructions make clear to the jurors that they are not to consider the judge's conduct when rendering a verdict.  The Court reread the instructions to the jury at the conclusion of trial and then voir dired the jury to

determine whether they would be able to follow the instructions. The jurors indicated they would.[18] Hence, there is no possibility that the jurors' verdict was affected by any conduct of the Court and Detective McKinley's argument to the contrary is frivolous.

### 12. Conclusion

Detective McKinley argues that, taken as a whole, the Court's rulings made a finding in favor of the White inevitable. Detective McKinley fails to recognize that the jury's verdict is based on the evidence, the jury's evaluation of the witnesses' credibility and Detective McKinley's trial strategy. Moreover, Detective McKinley has articulated no other reasonable manner in which the Court should have conducted the trial. The only possible alternative was to let all evidence in – relevant or not – and have a series of mini-trials and sub-mini-trials on tangential, inflammatory issues which would have likely lasted weeks or months. The strains on the litigants, the jurors, and the judicial system caused by proceeding in such a manner weigh against such broad admission of evidence; the Courts' appropriate rulings resulted in a manageable and understandable trial.

Finally, in considering whether the jury's verdict equates to a miscarriage of justice, the Court has considered all of the evidence - even that excluded - as well as the extensive testimony of Detective McKinley himself. It is undisputed that Detective McKinley did not take custody of the diary and the Missouri Court of Appeals has already held that even a lay person would know it should not be left with the complaining witness. The substantial

---

[18]The Court did this because of earlier allegations by McKinley's counsel that he was not being treated fairly.

46

weight of the evidence demonstrates that Tina and Detective McKinley were not truthful with the prosecutors and it is unrefuted that Detective McKinley was told to end the affair by the Chief of Police and did not. Furthermore, Tina told a co-worker that her boyfriend policeman was helping to get rid of Tina's husband. Even ignoring the rest of the evidence about which Detective McKinley complains, it is reasonable to expect that a juror would find in White's favor; particularly, given the credibility of Tina's and Detective McKinley's testimony and the failure of Detective McKinley to follow accepted police protocols.

Even if the Court had ruled in favor of Detective McKinley on every disputed point, it would not find that the trial outcome likely would have been different. *See generally Wilson v. City of Des Moines*, 442 F.3d 637, 641 (8th Cir. 2006) ("Only when the evidence excluded is of such a critical nature that there is no reasonable assurance that the jury would have reached the same conclusion had the evidence been admitted" does a district court abuse its discretion in denying a motion for a new trial) (citation and internal quotations omitted).

## III. Motion to Alter or Amend Judgment

Echoing his motion for a new trial argument concerning White's flight to Costa Rica, Detective McKinley argues that the damages award was excessive because it does not reflect time White would not have spent in jail absent the flight. At trial, White argued for $1.6 million in economic damages plus $3 million per year of incarceration; the jury awarded $14 million in actual damages. Detective McKinley complains he should have been allowed to argue that, had White not fled, his conviction would have been reversed earlier and he would

47

not have been incarcerated following that reversal. Detective McKinley requests that judgment be amended "to comply with evidentiary standards."

Though Detective McKinley asks the Court to enter judgment complying with evidence, he still does not explain what that evidence would be. Had Detective McKinley indicated that he had the necessary testimony showing White would have been out on bond, the Court could consider granting his motion. But he neither offered such evidence at trial nor in his post-trial motions.

"The jury's verdict should not be set aside or altered unless it 1) is flagrantly excessive or inadequate, 2) is so out of reason as to shock the conscience or sense of justice, 3) raises a presumption it is the result of passion, prejudice, or other ulterior motive, or 4) is lacking in evidentiary support." *Schooley v. Orkin Extermination Co.,* 502 F.3d 759, 768 (8th Cir. 2007). The evidence supported a finding that Detective McKinley deprived White of a fair trial by failing to disclose or preserve exculpatory evidence in bad faith, and that Detective McKinley conspired with Tina to do so. The evidence showed that White suffered financial and emotional losses and physical abuse in prison as a proximate result. The jury even found that punitive damages were appropriate. The Court cannot say that the jury's verdict falls within any of the categories allowing altered judgments.

Case 4:05-cv-00203-NKL   Document 417   Filed 03/26/09   Page 48 of 56

## IV.    Conclusion

Accordingly, it is hereby ORDERED that Defendant Detective McKinley's Motion for Judgment as a Matter of Law [Doc. # 367] and Motion for New Trial and Alternative Motion to Alter or Amend Judgment [Doc. # 369] are DENIED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  March 26, 2009
Kansas City, Missouri

49

## SPECIAL INTERROGATORIES TO THE JURY
## SUBMITTED BY DEFENDANT RICHARD MCKINLEY

1.      Do you believe that Theodore White sexually abused Jami?

        Yes                     No

2.      If you believe that Theodore White did not sexually abuse Jami, do you believe that because you believe Jami was not telling the truth?

        ☐ Yes                   ☐ No

3.      Do you believe that Plaintiff Theodore White did not sexually abuse Jami because of information that would have been in Jami's diary?

        ☐ Yes                   ☐ No

4.      Do you believe that Jami was not telling the truth about Plaintiff Theodore White sexually abusing her because Richard and Tina McKinley failed to disclose the nature and extent of their personal relationship to prosecutors?

        ☐ Yes                   ☐ No

5.      Do you believe that Tina and Richard McKinley had a personal relationship prior to Jami's allegations of sexual abuse?

        ☐ Yes                   ☐ No

6.      Do you believe the absence of Jami's diary deprived Theodore White of a fair criminal trial?

        ☐ Yes                   ☐ No

7.      Do you believe that Defendant Richard McKinley made a conscious effort to fail to secure Jami's diary or aid in the disappearance of Jami's diary?

        ☐ Yes                   ☐ No

8.     Do you believe Theodore White would have been deprived of a fair criminal trial if the Jackson County, Missouri Prosecutor's office would have disclosed the romantic relationship between Tina and Richard McKinley to Theodore White's criminal defense lawyers prior to his first criminal trial?

☐ Yes            ☐ No

9.     Do you believe that Defendant Richard McKinley made a conscious effort to misinform the prosecutor of the nature and extent of his personal relationship with Tina McKinley?

☐ Yes            ☐ No

Ladies and Gentlemen: I will take a few moments now to give you some initial instructions about this case and about your duties as jurors. At the end of the trial I will give you further instructions. I may also give you instructions during the trial. Unless I specifically tell you otherwise, all such instructions - both those I give you now and those I give you later - are equally binding on you and must be followed.

This is a civil case brought by the Plaintiff Theodore White against the Defendants Richard and Tina McKinley. The plaintiff alleges that the defendants intentionally deprived him of his right to a fair trial as secured by the United States Constitution. The defendants deny that allegation. It will be your duty to decide from the evidence whether the plaintiff is entitled to a verdict against the defendants.

From the evidence you will decide what the facts are. You are entitled to consider that evidence in the light of your own observations and experiences in the affairs of life. You will then apply those facts to the law which I give you in these and in my other instructions, and in that way reach your verdict. You are the sole judges of the facts; but you must follow the law as stated in my instructions, whether you agree with it or not.

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness says, or only part of it, or none of it.

In deciding what testimony to believe, consider the witnesses' intelligence, their opportunity to have seen or heard the things they testify about, their memories, any motives they may have for testifying a certain way, their manner while testifying, whether they said something

different at an earlier time, the general reasonableness of their testimony and the extent to which their testimony is consistent with other evidence that you believe.

Do not allow sympathy or prejudice to influence you. The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as I give it to you.

You should not take anything I may say or do during the trial as indicating what I think of the evidence or what I think your verdict should be.

Neither in these instructions nor in any ruling, action or remark that I have made during the course of this trial have I intended to give any opinion or suggestion as to what your verdict should be.

In conducting your deliberations and returning your verdict, there are certain rules you must follow.

First, when you go to the jury room, you must select one of your members as your foreperson. That person will preside over your discussions and speak for you here in court.

Second, it is your duty, as jurors, to discuss this case with one another in the jury room. You should try to reach agreement if you can do so without violence to individual judgment, because a verdict must be unanimous.

Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with your fellow jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinions if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right, or simply to reach a verdict. Remember at all times that you are not partisans. You are judges - judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

Third, if you need to communicate with me during your deliberations, you may send a note to me through the courtroom deputy, signed by one or more jurors. I will respond as soon as possible either in writing or orally in open court. Remember that you should not tell anyone - including me - how your votes stand numerically.

Fourth, your verdict must be based solely on the evidence and on the law which I have given to you in my instructions. The verdict must be unanimous. Nothing I have said or done is intended to suggest what your verdict should be - that is entirely for you to decide.

Finally, the verdict form is simply the written notice of the decision that you reach in this case. You will take this form to the jury room, and when each of you has agreed on the verdict, your foreperson will fill in the form, sign and date it, and advise the courtroom deputy that you are ready to return to the courtroom.